## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 07-00504 |
| | Chapter 11 |
| HOKULANI SQUARE, INC., | |
| a Hawaii corporation, | |
| Debtor. | |
| _____ | Adv. Pro. No. 07-90054 |
| WALTER Y.C. CHANG, et al., | |
| Plaintiffs, | |
| vs. | |
| STEVEN MONTGOMERY CROUCH, et al., | |
| Defendants. | Re: Docket No. 27, 259, 338 |

## MEMORANDUM OF DECISION
## REGARDING ALLEGED SETTLEMENTS

Plaintiffs Walter and Sylvia Chang and defendant Hokulani Square, Inc.

("Hokulani"), have filed cross-motions for summary judgment concerning the

existence and effect of two alleged settlements. The first settlement (the "Nextel

settlement") was reduced to a formal, fully executed settlement agreement. In the

second case, there was no formal settlement agreement, and the parties dispute

whether there was a binding settlement agreement.

Defendant Eadean Buffington also moves for summary judgment on the ground that the second alleged settlement resolved the Changs' claims against her.

I conclude that the Nextel settlement is enforceable but that the scope of the settlement agreement's release is ambiguous. Based on the admissible evidence in the record, I conclude that there was no binding second settlement.

1.

The following facts are (unless otherwise noted) not subject to a genuine dispute:

Until 2003, plaintiffs Walter and Sylvia Chang owned an eighteen unit apartment building located at 1415 Middle Street, Honolulu, Hawaii.

The Changs leased certain rooftop space in the building to Nextel WIP Lease Corp. ("Nextel") for use as an antenna site. The lease was dated December 12, 2001, and was amended by a document dated May 2003.

In 2003, the Changs sold the property to Hokulani Square, Inc. The purchase price was $2,000,000, $1,500,000 of which was secured by a first mortgage on the property. Hokulani intended to convert the building to a condominium and sell the units individually.

Hokulani contends that, prior to the sale, the Changs misrepresented the terms of the Nextel lease. The Changs deny this contention.

2

After the sale closed, Hokulani told Nextel that the lease was not binding on Hokulani and demanded that Nextel vacate the property. Nextel responded by suing Hokulani and the Changs for declaratory and injunctive relief on September 20, 2004. Nextel's complaint alleges that the Changs originally owned the property and signed the lease, that Hokulani subsequently purchased the property, and that Hokulani had actual or constructive notice of the lease. The Changs and Hokulani did not file cross claims against each other.

Nextel, Hokulani, and the Changs executed a settlement agreement on June 13, 2005. The settlement agreement provides that Nextel, Hokulani, and the Changs would release:

> any and all claims, counterclaims, cross claims, third-party claims, defenses, demands, damages, costs, expenses, actions and causes of action, past, present, or future, known or unknown, pleaded or unpleaded, suspected or unsuspected, concealed or unconcealed, for conduct, omissions, performance of promises, covenants, agreements, contracts, warranties, representations, and for special damages, general damages, compensatory damages, consequential damages, emotional distress, lost profits, lost wages, property damages, statutory damages, punitive damages, reimbursement, indemnity, contribution, subrogation, accounting, costs, attorneys' fees, equitable remedies, or any other claim for relief made, or that could be made by the Parties, or any of them, against the Parties, or any of them, arising out of, based upon, connected with, or otherwise related to any fact, claim, counterclaim, matter, allegation, or issue which was or could have been raised, stated or mentioned concerning the Action [Nextel's suit against Hokulani and the Changs] and the Agreement [the Nextel lease, as amended].

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 479   Filed   12/10/08   Page 3 of 22

Hokulani offers evidence that its then attorney, Robert Ferrigno, misrepresented the terms of the settlement to Hokulani and instructed Hokulani's signator not to read the agreement before signing it. Hokulani does not allege that Nextel or the Changs knew or should have known about, or were involved in, Mr. Ferrigno's alleged conduct.

In the meantime, the Changs signed documents that purport to subordinate the lien of their mortgage to new mortgages in favor of Investors Funding Corporation ("IFC"). The validity of the subordination is disputed, but that dispute is not before me now.

Later, the Changs sued Hokulani to collect the unpaid purchase price and foreclose the mortgage. IFC was named as another mortgagee. In the same action, the Changs sued the attorney who represented them in connection with the sale, Eadean Buffington, alleging that she had committed various wrongs.

Settlement negotiations began soon after the Changs filed suit. At that time, David Gierlach represented the Changs and Mr. Ferrigno represented Hokulani and (at least for some purposes) Ms. Buffington.

On January 27, 2006, Mr. Ferrigno made a settlement offer to the Changs, via Mr. Gierlach. Hokulani proposed to settle the case by paying the Changs "approximately" $100,000 per unit out of the sales proceeds of the units sold until

4

the Changs received a total of $1,500,000, that no interest would be paid or owed, that the distribution to the Changs would be made "side by side" with IFC, and that the defendants would make an additional lump sum payment of $275,000 "immediately upon your clients agreeing to our proposal, subject to the condition that Ms. Buffington obtains a separate, full and complete release from" the Changs.

On January 30, 2006, Mr. Gierlach responded to the January 27 offer. Mr. Gierlach wrote that the Changs "have advised me that they are willing to accept your clients [sic] offer to settle so long as certain security can be provided to them." The Changs offered to accept $100,000 per unit upon the sale of the first fifteen units, without interest. Mr. Ferrigno was to "secure the written authorization of [IFC] agreeing to this payment plan." He proposed either that the Changs record a lis pendens against each unit and release it upon sale "or you will propose to us a mutually acceptable form of security . . . ."

Mr. Gierlach wrote that the Changs would accept a lump sum payment of $275,000 from Ms. Buffington "payable upon the execution of the settlement agreement," that Ms. Buffington would be released and dismissed upon payment of the lump sum, and that Hokulani would not be released or dismissed until the Changs received the final payment. "It is understood and agreed that the total amount due and owing to my clients, from both Buffington and Crouch is $1.775

5

million dollars."

Mr. Gierlach proposed that "[Hokulani] agrees that [it] will use [its] best efforts to sell all of the units within twelve months of the date of the settlement agreement and that [the Changs] will be paid in full by the expiration of such time."

Mr. Gierlach told Mr. Ferrigno to inform him if Hokulani would accept the offer, and that, if so, Mr. Gierlach would prepare a formal settlement agreement.

Mr. Ferrigno responded the next day, January 31, 2006. He tendered a check drawn on his client trust account for $275,000 and said it was from Ms. Buffington. He proposed either a separate agreement for her "or an agreement that she is purchasing the unsecured note" (the $500,000 portion of the purchase price that was not secured by the mortgage). He acknowledged that Ms. Buffington was not entitled to an immediate release: "I understand that Ms. Buffington cannot obtain a full release until the main document is signed. However, if your clients want the funds immediately, they could release her separately, and, of course, that would be good for her." He discussed an alternative way of providing security to the Changs and stated that "the main challenge" is to get IFC to agree to the payment plan.

The Changs, Hokulani, and IFC signed escrow instructions, dated February

6

24, 2006. The instructions stated that, out of each unit sale, IFC would receive $150,000, then the Changs would receive $100,000, and Hokulani would receive any excess. The instructions also stated that any shortfalls would be carried forward and made up out of subsequent sales, and that IFC would have "first priority to this excess amount in the event that there is a shortfall to both it and the Changs." The instructions provided that the disbursements would continue until IFC received $1,963,500 plus interest and the Changs received $1,500,000 without interest. "If there are any changes, you will receive notice of such in writing and signed by the parties hereto in a separate writing such as this." The escrow instructions did not provide for a release of any claims by any parties or for dismissal of the litigation.

Subsequently, the parties repeatedly stated that there was no settlement. IFC's attorney wrote a letter to Mr. Gierlach on March 9, 2006, confirming that Mr. Gierlach was "proceeding to implement steps in a proposed settlement of the above matter," but that those steps had not been completed and that the "proposed settlement will not be in place until those steps are completed." On several occasions, Mr. Gierlach represented to the state court in the foreclosure case that the parties were negotiating a settlement or had reached a "quasi-settlement" but that the action should not be dismissed and various deadlines should be extended.

7

Mr. Ferrigno appeared in court for Hokulani and joined in one of Mr. Gierlach's requests. He did not dispute any of Mr. Gierlach's statements to the court about the status of the case. Still later, Mr. Ferrigno represented to the state court that settlement negotiations had taken place and were still in process. No one took any steps to have the state court case dismissed.

In January 2007, the Changs discharged Mr. Gierlach and hired a new attorney. Only one of the condominium units had been sold. No formal settlement agreement had been signed; Mr. Gierlach and Mr. Ferrigno both state that Mr. Gierlach showed one draft to Mr. Ferrigno, and that Mr. Ferrigno made handwritten changes on it, but no one has been able to identify that draft with certainty.

The Changs' new attorney filed an amended complaint in the state court. In response, Mr. Ferrigno sent a letter (docket no. 375, exhibit 17) insisting that there was a settlement agreement and stating that he would shortly send to the Changs' new attorney "'formal' settlement and release documents concerning Ms. Buffington . . . ." The Changs' new attorney responded (id. exhibit 18) that there was no enforceable settlement agreement and that, even if there were such an agreement, Hokulani had breached it.

Mr. Ferrigno then tendered a new and different settlement offer on behalf of

8

Hokulani. Although there was a further exchange of proposals, no one contends that a settlement was reached.

During this period, one more condominium unit sold. The sale proceeds were sufficient to pay the Changs only about $93,000.00.

On April 3, 2007, the Changs purported to revoke the escrow instructions. A flurry of further negotiations did not bear fruit.

On May 10, 2007, Hokulani filed a chapter 11 petition. Hokulani, the Changs, and IFC agreed to a procedure for the sale of the remaining condominium units. To date, however, only about six more units have been sold.

## 2.

Count IV of Hokulani's counterclaim alleges that the Changs made misrepresentations about the Nextel lease. The Changs seek dismissal[1] of this count, contending that the Nextel settlement extinguished Hokulani's misrepresentation claims.

## 2(a)

Hokulani argues that the Nextel settlement is not binding upon it because

---

[1]Hokulani argues that the Changs' motion is procedurally defective because, according to Hokulani, it is an improper hybrid of a rule 12 motion to dismiss and a rule 56 motion for summary judgment. This argument is specious. There is no doubt that the Changs' motion is a motion for summary judgment. Hokulani's response on the merits demonstrates that Hokulani's counsel understands that perfectly.

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 479   Filed  12/10/08   Page 9 of 22

Hokulani's attorney, Mr. Ferrigno, allegedly told Hokulani's signator, Mr. Crouch, not to read the document and allegedly misrepresented the contents of the document. This contention lacks merit. "[O]ne who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained." Courbat v. Dahana Ranch, Inc., 111 Haw. 254, 264, 141 P.3d 427, 437 (2006). If Hokulani's allegations are true, Hokulani has good claims against its attorney. But Hokulani does not even allege that either the Changs or Nextel were or should have been aware of, let alone that they were complicit in, what transpired between Hokulani and its attorney.[2] Absent such facts, Hokulani is bound by the Nextel settlement.

I will therefore grant partial summary judgment in favor of the Changs and hold that the Nextel settlement agreement is binding upon Hokulani.

## 2(b)

I hold that there are genuine issues of material fact concerning the scope of

---

[2]Hokulani argues that the motion should be denied or continued pursuant to rule 56(f) because Hokulani has not had an opportunity to conduct discovery against the Changs and Nextel. But Hokulani does not even allege that Nextel or the Changs had any inkling of what Mr. Ferrigno told Hokulani and does not produce any circumstantial evidence suggesting that Nextel or the Changs should have had any suspicions in that regard. Rule 56(f) does not require denial or deferral of summary judgment simply because a party hopes that discovery might reveal helpful evidence. Continental Maritime of San Francisco, Inc., v. Pacific Coast Metal Trades Dist. Council, 817 F.2d 1391,1395 (9th Cir. 1987); Apache Survival Coalition v. United States, 21 F.3d 895, 911 n. 17 (9th Cir. 1994)("Even if Appellants otherwise were entitled to discovery, it was within the district court's discretion to deny it when, as in the case, the complaining party could only speculate as to what it might discover.")

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 479   Filed 12/10/08   Page 10 of 22

the release included in the Nextel settlement.

"A contract term or phrase is ambiguous only if it is capable of being reasonably understood in more than one way." Wittig v. Allianz, A.G., 112 Hawaii 195, 201, 145 P.3d 738, 745 (2006). The determination of whether a contract is ambiguous is a question of law. If an ambiguity creates doubt about the intent of the parties, ascertaining that intent becomes a question of fact. Foundation International, Inc., v. E.T. Ige Const., Inc., 102 Haw. 487, 494-95, 497, 78 P.3d 23, 30-31, 33 (2003).

The Nextel settlement broadly released all claims among the parties, including claims between the Changs and Hokulani, "concerning the Action [meaning Nextel's suit against Hokulani and the Changs] and the Agreement [meaning the Nextel lease, as amended]." It is not clear from the face of the document[3] that the misrepresentation claims were released. One could reasonably say that Hokulani's claims for misrepresentation about the Nextel lease "concern" the lease and are therefore within the scope of the release. Just as reasonably, one could say that the claims do not "concern" the Nextel lawsuit or the Nextel lease but rather "concern" only the purchase and sale agreement between Hokulani and

---

[3]To determine whether a contract is ambiguous, one looks only at the four corners of the document. Id. at 497, 78 P.3d at 33.

11

the Changs and the promissory note and mortgage made by Hokulani in favor of the Changs.

This ambiguity creates a genuine issue of material fact. Therefore, I will deny summary judgment to all parties on the question of whether the Nextel settlement extinguished the Changs' claims against Hokulani, Hokulani's misrepresentation claims against the Changs, or both.

3.

Count I of Hokulani's counterclaim alleges that, when the Changs revoked the escrow instructions, the Changs breached a settlement agreement with Hokulani. The Changs move for summary judgment on this claim, contending that there was no settlement agreement. Hokulani countermoves for a summary judgment that there was an enforceable settlement agreement.

The evidence relevant to the alleged settlement can be divided into two categories. The first category consists of the documents which, according to Hokulani, embody the settlement agreement. These documents are Mr. Gierlach's letter of January 30, 2006, Mr. Ferrigno's letter of January 31, 2006, and the escrow instructions of February 24, 2006. The second category consists of all of the other evidence offered on this point.

As a matter of law, the two letters and the escrow instructions do not create a binding settlement agreement.

A binding contract requires objective proof of mutual assent to the essential terms of the agreement. United Pub. Workers v. Dawson Int'l, Inc., 113 Haw. 127, 141, 149 P.3d 495, 509 (2006). There must be an offer, acceptance, and consideration. "[A]n acceptance of an offer must be unconditional and identical with the terms of the offer." Schlosser v. Perez, 832 So.2d 179, 182 (Fla. App. 2 Dist. 2002). "[A] qualified acceptance constitutes a counter offer and a rejection of the original offer." Honolulu Rapid Transit, Ltd., v. Paschoal, 51 Haw. 19, 25, 449 P.2d 123, 126-27 (1968).

Mr. Gierlach's letter of January 30, 2006, constituted a counteroffer to and rejection of Mr. Ferrigno's prior proposals. Although Mr. Gierlach reported that his clients would "accept" Mr. Ferrigno's offer, his proposal varied from the prior offers and added several provisions. For example, Mr. Ferrigno said that the payment to the Changs out of each sale would be "approximately" $100,000; Mr. Gierlach's proposal called for a payment of $100,000, no more and no less. Mr. Gierlach's proposal for "security" was also not part of Mr. Ferrigno's offer. Finally, Mr. Gierlach's proposal for the timing of the release of claims against Ms.

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 479   Filed 12/10/08   Page 13 of 22

Buffington was different from Mr. Ferrigno's, and Mr. Gierlach's letter makes it clear that the settlement with Hokulani and Ms. Buffington were a single transaction.

Mr. Ferrigno's response of the following day was not an unconditional acceptance of all of the terms of Mr. Gierlach's offer. It was conditioned on obtaining IFC's agreement to the payout to the Changs and it proposed new mechanisms for providing security to the Changs and resolving the claims against Ms. Buffington. Nor was it a new offer because it did not deal with many essential terms of any settlement. The January 31 letter therefore did not create a binding settlement agreement.

The escrow instructions do not constitute an acceptance of Mr. Gierlach's offer of January 30 because they vary from Mr. Gierlach's offer. Most importantly, Mr. Gierlach's offer provided that the Changs would be paid $100,000 from each unit sale. Under the escrow instructions, the Changs would receive $100,000 from each sale only if the unit sold for at least $250,000 net of closing costs (because IFC was to receive the first $150,000). This is a material difference because no one could be sure how much the units were worth, and, in fact, the second unit sold netted less than $250,000. Also unlike Mr. Gierlach's offer, the escrow instructions do not require full payment of the Changs within

14

twelve months. Therefore, the escrow instructions did not operate as an acceptance of Mr. Gierlach's offer of January 30.

Nor do the escrow instructions constitute a settlement agreement standing alone. The instructions do not provide for any releases of claims or for the dismissal of the litigation. They say nothing about the treatment of the Changs' claims for the excess over $1,500,000. They say nothing about the separate lump sum payment.

Hokulani attempts to construct a settlement agreement by cobbling together selected provisions of the two letters and the escrow instructions. To do this, Hokulani must ignore the fact that Mr. Gierlach's proposal provided that the Changs would be paid within twelve months. Hokulani argues that the parties must have agreed to delete this provision because it did not appear in the escrow instructions and the escrow instructions included all the material terms of the settlement. Hokulani offers no evidence at all, however, that the parties intended to include all of the material terms of the settlement in the escrow instructions. (In fact, Mr. Crouch's declaration says that the escrow instructions documented "part" of the settlement.) At the same time, Hokulani argues that the settlement includes a term that is <u>not</u> found in the escrow instructions – a mutual release of claims – but which was found in (or implied by) Mr. Gierlach's letter. This argument

15

contradicts Hokulani's prior argument that the escrow instructions included all of the material terms of the settlement.

Even viewing them in the light most favorable to Hokulani, the two letters and the escrow instructions, read without resort to any extrinsic evidence, do not amount to a settlement agreement.[4]

3(b)

Apart from the three documents, the admissible evidence in the record indicates that there was no settlement.

First, Mr. Gierlach's declaration (docket no. 28) states that there was no settlement ("no meeting of the minds occurred regarding several of these terms" proposed in his letter of January 30, 2006, id. ¶13; when the escrow instructions were signed, "the parties had not reached a settlement," id. ¶19; "there was no settlement agreement between the parties as to the claims made" in the foreclosure action, id. ¶21; "settlement discussions subsequently stalled and were abandoned," id. ¶22).

Second, in the months after the escrow instructions were signed, Mr. Gierlach, counsel for IFC, and Mr. Ferrigno each said (repeatedly, in Mr.

---

[4]The Changs argue that the lack of a formal, executed settlement agreement is itself fatal to Hokulani's argument. "[W]hen parties intend to be bound only by a written agreement, their oral exchanges of assent do not bind them." Cable & Computer Tech. Inc. v. Lockheed Sanders, Inc., 214 F.3d 1030, 1034 (9th Cir. 2000). The record at this point is not sufficient to support a summary judgment on this issue of intent.

16

Gierlach's case) that there was no settlement, and no one disputed any of those statements.

Third, Mr. Ferrigno states in his declaration (docket no. 260) that, when he delivered the partially executed escrow instructions to Mr. Gierlach, Mr. Gierlach showed him a draft settlement agreement which he revised and left with Mr. Gierlach. This indicates that neither Mr. Gierlach nor Mr. Ferrigno believed that the escrow instructions were intended to be a settlement agreement.

Fourth, although Hokulani has offered several declarations of its principals, Mr. and Mrs. Crouch, those declarations contain no admissible evidence that there was a settlement. Mr. Crouch's declarations of October 10, 2008 (docket no. 342-3) and November 12, 2008 (docket no. 419-3) and Mrs. Crouch's declaration of October 10, 2008 (docket no. 338-4), are completely silent on this subject. Mr. Crouch's declaration of October 10, 2008 (docket no. 338-5), says only that "the parties settled the Foreclosure Action in January 2006." He says nothing at all about the terms of the settlement and does not explain how the case was settled in January when the escrow instructions, which Hokulani views as the key settlement document, were not signed until February. In another declaration (docket no. 396-8), he says that the escrow instructions "documented the part of the settlement involving the apartment sales and distribution of proceeds to the Changs and

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 479   Filed 12/10/08   Page 17 of 22

[IFC]," but again he says nothing about the other terms of the settlement. Further, he admits in the same declaration that he lacks personal knowledge of the settlement negotiations; he says that he did not see the letters that Mr. Gierlach and Mr. Ferrigno exchanged during January 2006 until about a year later and that, because Mr. Ferrigno did not send him copies of the letters, he "was unaware of the terms of settlement being offered."

Fifth, Mr. Ferrigno, the attorney who negotiated directly with the Changs' attorney, offers no evidence that there was a settlement. Mr. Ferrigno's declaration (docket no. 338-19) never says that there was a settlement. As noted above, Mr. Ferrigno told the state court that there was no settlement and never objected to Mr. Gierlach's numerous statements to the court that there was no settlement. Mr. Ferrigno did send a letter to the Changs' successor counsel in which he claimed that there was a settlement, but he made no further attempt to enforce the alleged settlement, he never drafted a settlement agreement as he promised and, about a month later, he told the state court that settlement negotiations were still ongoing.

Although a court generally must refrain from weighing the evidence on a motion for summary judgment, a court can and should determine whether any evidence is offered to establish each material point. Under rule 56(e), a respondent to a motion for summary judgment must offer evidence, as opposed to simple

18

allegations, in support of the respondent's view of the facts. "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Further, if the respondent's evidence could not persuade a reasonable jury to rule in favor of the respondent, there is no "genuine" issue of fact and summary judgment may be appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).

The three documents upon which Hokulani relies do not independently amount to a settlement agreement. Hokulani offers no admissible extrinsic evidence that would convince a reasonable trier of fact that there was a settlement.

Hokulani suggests that the court should deny or continue the Changs' motion to permit Hokulani to conduct discovery. Hokulani does not explain, however, why the declarations of its own principals (Mr. and Mrs. Crouch) and its former attorney (Mr. Ferrigno) fail to state that there was a settlement. Because Hokulani's own witnesses have not testified that there was a settlement, there is no reason to defer the decision of this issue.

I therefore hold there was no settlement agreement between the Changs and Hokulani. Consequently, I will deny Hokulani's motion in part, grant the Changs' motion in part, and enter judgment in favor of the Changs as to Count 1 of Hokulani's counterclaim.

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 479   Filed 12/10/08   Page 19 of 22

4.

Counts II and III of Hokulani's counterclaim assert tort claims arising out of the Changs' revocation of the escrow instructions. Hokulani contends that the Changs interfered with pending and prospective sales of condominium units and with Hokulani's contractual relationship with IFC.

In order to prevail on the theories of interference with contract or with prospective business advantage, the plaintiff must establish (among other things) "legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy," and "actual damages." Robert's Hawaii Sch. Bus, Inc., v. Laupahoehoe Trans. Co., 91 Haw. 224, 258, 982 P.2d 853, 887 (1999), superseded by statute on other grounds, 2002 Haw. Sess. L. Act 229, § 2. Hokulani must establish that, but for the Changs' revocation of the escrow instructions, Hokulani would have sold some or all of the condominium units sooner than it did. Hokulani offers no evidence to support this proposition. Mr. Crouch's declaration (docket no. 338-5) states that "Escrow was scheduled to close in 3 days and these sales were about to be funded," but Mr. Crouch does not state from when the three day period ran and he does not say, based on his personal knowledge, that any or all of the sales would have closed at any particular time but for the Changs' revocation of the escrow instructions.

U.S. Bankruptcy Court - Hawaii    #07-90054    Dkt # 479    Filed 12/10/08    Page 20 of 22

I will therefore grant summary judgment in favor of the Changs on Counts II and III of Hokulani's counterclaim.

5.

Ms. Buffington also moves the court to enforce the alleged settlement agreement against the Changs.

There is no evidence that the Changs ever agreed to settle separately with Ms. Buffington, in the absence of a settlement with Hokulani. Mr. Gierlach's January 30, 2006 proposal was for a single settlement involving two sets of payments, one lump sum payment from Ms. Buffington and a second stream of payments from Hokulani. His letter makes clear that, although Ms. Buffington might become entitled to a release and dismissal earlier than Hokulani, there would be no settlement with either Hokulani or Ms. Buffington until there was a settlement with both of them. (Ms. Buffington was not to be released until all parties had signed the settlement agreement, and he described the settlement as providing for a total payment of $1,775,000 from Hokulani and Ms. Buffington.) Mr. Ferrigno's letter of January 31 acknowledges that Ms. Buffington would not be released until "the main document" is signed. Because there was no settlement between Hokulani and the Changs, there was also no settlement between Ms. Buffington and the Changs.

21

Ms. Buffington also fails to offer any extrinsic evidence that there was a settlement. Ms. Buffington's and Mr. Ferrigno's declarations (docket no. 260) never state that she had a settlement agreement with the Changs.

The fact that Mr. Ferrigno tendered the $275,000 to Mr. Gierlach does not change this conclusion. Mr. Ferrigno tendered the money unconditionally and without any express reservations or conditions. Mr. Ferrigno's letter, with which he transmitted the money, confirms that Ms. Buffington was not entitled to a release until there was a settlement with Hokulani. The Changs' attorney always held all of the money in trust and disbursed none of it to the Changs or anyone else.

Therefore, I will deny Ms. Buffington's motion for summary judgment.

6.

In the alternative, Ms. Buffington seeks leave to file a third-party complaint against the Changs' attorney for fraud and conversion. The request is procedurally defective because Ms. Buffington has failed to file a proposed pleading as LR 10.3 requires. Further, it is not necessary to assert claims against the attorney. He holds the funds strictly as agent for the Changs. If additional claims are warranted, they should be asserted against the Changs only. Therefore, this request is denied.

*/s/ Robert J. Faris*
**United States Bankruptcy Judge**
Dated: **12/10/2008**

22