## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 07-00504 |
| | Chapter 11 |
| HOKULANI SQUARE, INC., | |
| a Hawaii corporation, | |
| Debtor. | |
| _____ | Adv. Pro. No. 07-90054 |
| WALTER Y.C. CHANG, et al., | |
| Plaintiffs, | |
| vs. | |
| STEVEN MONTGOMERY CROUCH, et al., | |
| Defendants. | Re: Docket No. 71, 112 |

## MEMORANDUM OF DECISION
## REGARDING LIEN PRIORITY

Defendant Investors Funding Corporation ("IFC") and plaintiffs Walter and

Sylvia Chang have filed cross-motions for summary judgment concerning the

priority of their liens. IFC holds a mortgage on two pieces of property owned by

defendant Hokulani Square, Inc. ("Hokulani"), at 1415 Middle Street (the "Middle

Street property") and 1320 N. School Street (the "School Street property") in

Honolulu. The Changs hold a mortgage on the Middle Street property and claim

an equitable lien on the School Street property.

The Changs' mortgage on the Middle Street property was recorded before IFC's mortgage. IFC claims priority over the Changs based on two subordination agreements. The Changs deny that they knowingly signed either subordination agreement and claim that the agreements are invalid due to fraud.

IFC has a mortgage on the School Street property; the Changs have no mortgage on that property but they claim an equitable lien. IFC contends that its mortgage on the School Street property has priority over the Changs' alleged equitable lien because the School Street property is subject to the land court recording system and the claimed equitable lien was not noted on the transfer certificate of title to the School Street property when IFC took its mortgage interest. (IFC also denies that the Changs are entitled to an equitable lien at all, but the pending motions do not present that question.)

The Changs also contend that IFC's mortgage should be subordinated to their mortgage on the Middle Street property and equitable lien on the School Street property under the doctrine of equitable subordination.

I conclude that there are genuine issues of material fact concerning whether the Changs were the victims of fraud in the factum concerning the subordination agreements. I also conclude that IFC is entitled to summary judgment on the

2

issues of fraud in the inducement, lack of consideration, priority of the equitable lien on the School Street property, and equitable subordination.

1(a).

Until 2003, plaintiffs Walter and Sylvia Chang owned the Middle Street property, including the eighteen unit apartment building built on it.

In March 2003, the Changs agreed to sell the Middle Street property to Steve and Naomi Crouch. Mr. and Mrs. Crouch planned to convert the building to a condominium and sell the units individually. The terms of the sale are disputed, but there is no dispute that Mr. and Mrs. Crouch were to pay the Changs $2,000,000 for the Middle Street property.

In June 2003, Mr. and Mrs. Crouch formed Hokulani, apparently for the purpose of acquiring the Middle Street Property.

The Changs did not convey the Middle Street property to the buyer for several months after they agreed to sell the property. A deed of the Middle Street property by the Changs to Hokulani, and a mortgage by Hokulani in favor of the Changs, were recorded in the Bureau of Conveyances of the State of Hawaii on September 24, 2003. The Changs have testified that they did not learn about the mortgage (which bore only the signature of the mortgagor, Hokulani) until much

3

later.

In the fall of 2003, IFC agreed to loan Hokulani $600,000 provided that it obtained a first lien on the Middle Street property. This required subordination of the Changs' mortgage. When the IFC loan closed on October 17, 2003, a mortgage by Hokulani in favor of IFC, and a Subordination Agreement and Partial Release Agreement (the "First Subordination Agreement") bearing the signatures of IFC, the Changs, and Hokulani, were recorded in the Bureau of Conveyances, State of Hawaii.

The Changs deny that they knowingly signed the First Subordination Agreement. They have not produced any evidence that someone forged their signatures on the document and cannot explain how their signatures came to be on the document, but they argue that they would not have signed it but for a fraud. Jennifer Lau, the notary public who acknowledged the Changs' signatures, has admitted that her notarial license expired in 1998 and has given inconsistent deposition testimony concerning whether her acknowledgment page was attached to the First Subordination Agreement (or, for that matter, any document) when she signed it.

Later, Hokulani wanted to purchase the School Street property. Hokulani also needed to refinance the first IFC loan because it had become due. IFC agreed

4

to make a new loan to Hokulani of $1,963,500 to refinance the first IFC loan, finance Hokulani's acquisition of the School Street property, and pay fees and interest. IFC again insisted on a subordination of the Changs' mortgage. When the second loan closed on January 5, 2005, a "Subordination Agreement" (the "Second Subordination Agreement") bearing the signatures of IFC, the Changs, and Hokulani was recorded.

As in the case of the First Subordination Agreement, the Changs deny that they knowingly signed the Second Subordination Agreement. They have not produced any evidence that someone forged their signatures on the document and cannot explain how their signatures ended up on the document but they argue that they would not have signed it but for a fraud.

1(b).

Many of the facts relevant to the alleged fraud on the Changs are not admitted.

Eadean Buffington acted as the Changs' attorney in connection with the Middle Street sale. The Changs contend that, during this representation, Ms. Buffington engaged in questionable conduct of various kinds.

Throughout the relevant period, the attorney was in financial trouble. She

5

owed several hundred thousand dollars to the Internal Revenue Service. The IRS attempted to collect the debt by periodically "sweeping" her bank accounts. Her credit report shows that she also had trouble paying other creditors on time. She was involved (to an extent which the record does not make clear) in an FBI investigation of tax evasion by certain of her clients; she testified before a grand jury and wore a concealed listening device while speaking to some of the alleged perpetrators. She was therefore under considerable pressure while she was representing the Changs.[1]

Ms. Buffington prepared an Agreement of Sale covering the Middle Street Property, dated January 2003. This document has several questionable features. First, the agreement states that the seller is a charitable remainder unitrust ("CRUT") established by the Changs. But Ms. Buffington knew that the Changs never formed a CRUT (although Ms. Buffington had recommended that they do so). Second, the document bears purported signatures of Ms. Buffington and Pauline Chin, the Changs' daughter, as trustees of the (nonexistent) CRUT. Ms. Chin testified that the signature on the document is not hers, and it does not

---

[1]The Changs also contend that Ms. Buffington and Mr. Crouch met and spoke frequently, often without the Changs' participation and knowledge. This fact is not particularly probative of fraud; it is not suspicious or wrong for an attorney to meet with an adverse party in order to discuss a client's business.

6

appear to match exemplars of her signature.  Third, the agreement states that the buyer was Hokulani, but Hokulani was not even formed until six months after the date of the agreement.  Fourth, Mr. and Mrs. Crouch testified that they actually signed the document in August or September 2003, not January 2003, and that the document was backdated at Ms. Buffington's instruction.  Mr. and Mrs. Crouch also testified that the notary who acknowledged the Crouches' signatures backdated her acknowledgment; the same notary acknowledged the Changs' signatures on the Second Subordination Agreement.[2]

In August 2003, Ms. Buffington applied for a loan from IFC (at about the same time as Hokulani was negotiating with IFC for its first loan and IFC was conditioning its approval on a subordination of the Changs' mortgage).  IFC learned that Ms. Buffington (who IFC also knew was the Changs' attorney) was in bad financial condition.  (Further, it is always dangerous for an attorney to do personal business with a client's adversary.)

According to the Changs, Ms. Buffington benefitted personally from IFC's $600,000 loan which the First Subordination Agreement enabled.  Within days after the loan closed, Hokulani paid Ms. Buffington $50,000.  Ms. Buffington

---

[2]No one claims that the agreement of sale is operative or binding.  The Changs refer to it as evidence of their attorney's alleged propensity to falsify documents.

7

denied that she was bribed and testified that she "did not improperly get the Changs to execute the first subordination agreement." Docket no. 327-2 p. 27 ¶¶ 9, 10. Ms. Buffington testified that she and Hokulani initially agreed that the payment would represent fees for her work for the Changs on the Middle Street sale and other matters and that the Changs consented to this arrangement (which the Changs deny). She testified that the deal subsequently changed (for reasons which her testimony does not make clear) and she was to hold the money in order to make the periodic interest payments on Hokulani's debt to the Changs. Mr. Crouch testified that this is a "lie" and that the $50,000 was always supposed to be applied to the interest payments and nothing else. In any event, Ms. Buffington kept a substantial portion of the $50,000 and did not use all of it to pay the Changs.

Ms. Buffington prepared an extension agreement, dated May 2004, that purported to extend the maturity date of Hokulani's debt to the Changs from December 31, 2004, to December 31, 2006. Ms. Buffington testified that she saw the Changs sign the extension agreement. The Changs contend that this is false and that, instead, Ms. Buffington fabricated the document. The Changs offered evidence that they could not have signed the agreement on the day that Ms. Buffington says they signed it because they were on a flight to Hong Kong that

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 795   Filed 04/13/09   Page 8 of 26

departed at 8:30 a.m. They have also pointed out that the signature page appears identical to the signature page of the warranty deed of the Middle Street property, and that the notary who acknowledged their signatures made no record of the acknowledgment in her notary book. Ms. Buffington claims she made notes of a meeting at which the Changs agreed to the extension, but the Changs point out that the notes refer to a lis pendens which was not filed for several months after she claims the meeting occurred.

According to the testimony of the Changs, their daughter (Ms. Chin), and their real estate agent, when Ms. Buffington was handling other real estate transactions for the Changs, Ms. Buffington sometimes had the Changs sign extra signature pages in case they were needed for the contemplated transactions. Ms. Chin and Mrs. Crouch also testified that April Hill, the notary who acknowledged the Changs' signatures on the Second Subordination Agreement, would sometimes notarize their signatures on documents that they had not signed in her presence.

With regard to the First Subordination Agreement, the Changs offered circumstantial evidence that Ms. Buffington had the opportunity and the motive (the $50,000 payment she received from Hokulani, out of the proceeds of the first IFC loan) to deceive them. There is also some evidence of questionable behavior in connection with their signatures (the fact that the purported notary was not a

9

notary and that the notary testified inconsistently about whether her acknowledgment page was attached to the First Subordination Agreement when she signed it). With regard to the Second Subordination Agreement, however, the Changs' case is weaker. There is no evidence that Ms. Buffington benefitted personally from the Second Subordination Agreement (although the Changs speculate that she did benefit in some as yet unknown way). The Changs point out that they did not sign April Hill's notary book when she acknowledged the Second Subordination Agreement. They also contend that the alleged pattern of misconduct by the attorney would be sufficient to support a jury verdict in favor of the Changs on the issue of fraud pertaining to the Second Subordination Agreement.

1(c).

On September 23, 2005, the Changs filed suit in state court to collect the debt owed by Hokulani. They also asserted claims against Ms. Buffington. In the meantime, the complaint has been amended five times.

On May 10, 2007, Hokulani filed a chapter 11 petition. Shortly thereafter, Hokulani removed the foreclosure proceeding to this court.

IFC filed a motion for partial summary judgment (docket no. 71) and the

10

Changs filed a countermotion (docket no. 112). At the Changs' request, pursuant to Fed. R. Civ. P. 56(f), the hearing on the motion was continued for discovery. The further hearing was held and the motions are ready for decision.

## 2.

The Changs argue that, even if they signed the subordination agreements, they received no consideration and that therefore both agreements are invalid. This argument rests on an incorrect definition of consideration. "Consideration is defined as a bargained for exchange whereby the promisor receives some benefit <u>or the promisee suffers a detriment</u>." <u>Shanghai Inv. Co. v. Alteka Co.</u>, 92 Haw. 482, 496, 993 P.2d 516, 530 (2000) (emphasis added), <u>overruled on other grounds</u>, <u>Blair v. Ing</u>, 96 Haw. 327, 31 P.3d 189 (2007). If the promisee incurs a detriment, it does not matter that the promisor receives no benefit. <u>Trousseau v. Cartwright</u>, 10 Haw. 138, 142 (1895). Similarly, consideration is sufficient even if it flows to a third party. The court does not need to consider what induced the promisor to make the promise for the third party. <u>Metropolitan Casualty Ins. Co. v. Realty Dev. Co.</u>, 32 Haw. 667, 675-77 (1933).

In this case, based on the subordination agreements, IFC incurred a detriment (it lent substantial sums to Hokulani) and Hokulani received a benefit (a

11

large loan from IFC).  This is adequate consideration to support the subordination agreements.

3.

The Changs argue that the subordination agreements were not properly notarized and are therefore invalid.

The First Subordination Agreement was not properly acknowledged. Jennifer Lau, who purported to notarize that document, initially stated in a sworn declaration that she was a licensed notary until 2006 and that the First Subordination Agreement was complete when she acknowledged it.  In her deposition, she testified that her declaration was incorrect, that her notary's commission lapsed in 1998, not 2006, and that she did not know whether the pages attached to her acknowledgment were the First Subordination Agreement or some other document.

April Hill, who acknowledged the Changs' signatures on the Second Subordination Agreement, was a licensed notary.  She did not, however, have the Changs sign her notary book when they signed the document, contrary to Haw. Rev. Stat. § 456-15(3).

Therefore, neither of the subordination agreements was notarized in full

12

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 795   Filed 04/13/09   Page 12 of 26

compliance with Hawaii law.

The Changs argue that defectively acknowledged documents are invalid. This is incorrect. A properly acknowledged document is presumptively valid. It does not follow, however, that a defectively acknowledged document is invalid. The defect negates the presumption of validity but does not invalidate the document or raise a presumption of invalidity. Chun Chew Pang v. Chun Chew Kee, 49 Haw. 62, 73, 412 P.2d 326, 332 (1966) (there is a "presumption raised [that when] the certificate of acknowledgment is complete and regular on its face, [then] the facts stated therein are true. Further, even if the certificate had been false and the deed not properly acknowledged, this would not affect the validity of the deed as between the parties to the deed." )

In other words, the defects in the acknowledgments lighten the Changs' burden of proof at trial but are not independently sufficient to permit the Changs to prevail.


4.

The Changs state in their declarations that they did not "knowingly" sign either of the subordination agreements. Standing alone, this testimony would not be sufficient to defeat IFC's motion for partial summary judgment. "[O]ne who

13

assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained." Courbat v. Dahana Ranch, Inc., 111 Haw. 254, 264, 141 P.3d 427, 437 (2006). In other words, if the Changs signed the documents simply without reading them, the Changs would still be bound by them.


5.

Similarly, the Changs have suggested that their signatures on the subordination agreements may have been forged. As of yet, no party has offered any evidence of forgery. The Changs point out, however, that no one claims to remember seeing the Changs sign the Second Subordination Agreement and that (as noted above) neither subordination agreement was properly notarized.

This decision will not determine whether or not the Changs actually signed the Second Subordination Agreement. Although April Hill apparently has no current recollection of the Changs' execution of that document and her acknowledgment is invalid, her testimony might (or might not) still be admissible and might (or might not) be enough to convince a reasonable jury that the Changs actually signed the document. Further, the discovery period has not ended and the deadline for exchanging expert reports has not passed, so the issue of forgery should not be foreclosed.

14

6.

The Changs contend that they signed the subordination agreements because of a fraud. The Changs disclaim personal knowledge about how they were defrauded (because they testify that they did not knowingly sign the documents and that they did not even learn that the documents existed until much later). In addition to this handicap, the Changs bear a heavy burden of proof.

Fraud must always be proven by clear and convincing evidence, meaning the "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established and requires the existence of a fact to be highly probable." Kekona v. Abastillas, 113 Haw. 174, 180, 150 P.3d 823, 829 (2006).

This high standard is particularly apt because this case turns on written agreements.

> In dealing with written contracts, the standard of proof with respect to a showing of fraud is extremely high. A written contract will be cancelled because of fraud only in a "clear case and upon strong and convincing evidence."

Kang v. Harrington 59 Haw. 652, 656-57, 587 P.2d 285, 289 (1978).

Further, in order to prevail, the Changs probably have to prove that they are the victims of fraud in the factum, rather than fraud in the inducement.

15

> Fraud in the factum is fraud which goes to the nature of the document itself. Fraud in the inducement is fraud which 'induces the transaction by misrepresentation of motivating facts (such as) value, or extent, usefulness, age, or other characteristic of (the property).'

Adair v. Hustace, 64 Haw. 314, 320 n.4, 640 P.2d 294, 299 n.4 (1982).

This distinction matters in this case because a document signed as a result of fraud in the factum is void while fraud in the inducement renders the document merely voidable. A void document is invalid and unenforceable even if the rights of a bona fide purchaser have intervened. A voidable document, however, cannot be set aside if doing so would harm a bona fide purchaser. "[A]n action to cancel a deed for fraud may be maintained against a true bona fide purchaser if the alleged fraud is fraud in the factum, but not if it is fraud in the inducement." Id.

Gonsalves v. Ikei, 47 Haw. 145, 384 P.2d 300 (1963), is a classic example of fraud in the factum. A real estate agent induced the owner of a dairy farm to sign a lease and a consent to a mortgage (and arranged for a notary to sign a false acknowledgment). The agent did not tell the owner, who spoke no english, what the documents really were, but instead told her that the documents related to a future sale that she might later decide to make. The trial court held that the documents were void, and the supreme court affirmed. "The fraud perpetrated on defendant Ikei went to the nature of the document and not mere details, and therefore, all of the documents were void and not merely voidable." Id. at 147, 384

16

P.2d at 304.

6(a).

If the Changs establish that they signed the subordination agreements as the result of fraud in the inducement, the agreements are still valid as to IFC unless they also establish that IFC is not a bona fide purchaser.

> An innocent purchaser is "one who, by an honest contract or agreement, purchases property or acquires an interest therein, without knowledge, or means of knowledge sufficient to charge him in law with knowledge, of any infirmity in the title of the seller."

Ka'u Agribusiness Co. v. Heirs of Ahulau, 105 Hawaii 182, 193, 95 P.3d 613, 624 (2004) (quoting Pelosi v. Wailea Ranch Estates, 91 Hawaii 478, 489, 985 P.2d 1045, 1056 (1999)).

There is no evidence that IFC had actual knowledge of any fraud upon the Changs. The Changs argue, however, that IFC knew other facts that should have led IFC to investigate further. To summarize, the Changs contend that (1) IFC's principal thought that the Changs' attorney, Ms. Buffington, "didn't know what she was doing as a real estate attorney," and knew that her financial condition was bad, (2) IFC knew that Mr. Crouch, one of Hokulani's principals, had a criminal conviction and a checkered legal history, but IFC still relied upon him to obtain the Changs' signatures, (3) the condominium project was behind schedule, and (4) the

17

subordination did not benefit the Changs, and to the contrary increased their risk.

These assertions, taken as true, are not sufficient to raise a genuine issue of fact about IFC's status as a bona fide purchaser. IFC obtained two subordination agreements, regular in form and bearing what appeared to be proper acknowledgments. Even taking all of the Changs' allegations as true, IFC had no reason to suspect that (as the Changs imply) Ms. Buffington lied to her own clients in order to induce them to sign the subordinations. The evidence would not support a verdict by a reasonable jury that IFC was not a bona fide purchaser.

The Changs rely on Ashmore v. Herbie Morewitz, Inc., 252 Va. 141, 475 S.E.2d 271 (1996). An elderly widow sold her home to a corporation and provided seller financing secured by a first mortgage on the property. The corporation agreed that the widow could remain in the home as a renter. She signed a document at the request of the corporation that subordinated her mortgage to a new first mortgage. The trial court found that the widow knew that the document was a subordination agreement but the corporation fraudulently represented to her that the document was "just a routine document" that would not affect her "position." The trial court therefore held that the agreement was voidable but that, because the new lender had no notice of the fraud, it was still entitled to the benefit of the subordination. The Virginia Supreme Court affirmed the trial court's decision that

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 795   Filed 04/13/09   Page 18 of 26

the agreement was voidable, not void, but reversed the trial court's decision about priority. The court cited the Virginia "third party beneficiary" statute, which provides that an intended third party beneficiary can enforce a covenant or promise, but that "the covenantor or promisor shall be permitted to make all defenses he may have, not only against the convenantee or promisee, but against such beneficiary as well." The court held that this statute permitted the new lender to enforce the subordination agreement against the widow, but that the widow could assert against the new lender any defenses that she had against the corporation, her original borrower, including the defense of fraud in the inducement, regardless of whether the new lender was innocent.

Ashmore is inapplicable for two reasons. First, IFC was a party to both subordination agreements, not a third party beneficiary. Second, the Changs cite no Hawaii statute or doctrine similar to the Virginia third party beneficiary statute which controlled the result in Ashmore.


6(b).

IFC's status as a bona fide purchaser does not, however, preclude the Changs from avoiding the subordination agreements if the Changs can establish fraud in the factum.

19

IFC argues that the Changs have not produced any evidence that anyone deceived them about the contents of the Second Subordination Agreement. The Changs respond in two ways.

First, they point to the alleged pattern of misconduct by Ms. Buffington and contend that a jury could infer that she misrepresented the contents of the Second Subordination Agreement to them.

Second, they say that they went to Ms. Buffington's office to pick up a check dated December 27, 2004, that they do not recall signing anything on that occasion but that, if Ms. Buffington asked them to sign a receipt, they probably would have done so. April Hill's acknowledgment states that the Changs signed the Second Subordination Agreement on December 28, 2004. The Changs argue that a jury could reasonably infer that Ms. Buffington induced the Changs to sign the Second Subordination Agreement by telling them that it was merely a receipt.

The question comes down to whether a reasonable jury could decide that the Changs signed the Second Subordination Agreement as a result of fraud in the factum. If so, there is a "genuine" issue of fact and summary judgment is not appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).

I conclude, based on the existing state of the record, that a genuine issue of fact exists concerning whether there was fraud in the factum. I cannot reasonably

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 795   Filed 04/13/09   Page 20 of 26

eliminate the possibility that the Changs were tricked in this fashion. There was no rational reason for the Changs to sign the subordination agreements. Their rights and claims to the Middle Street property were significantly diminished and the risk of nonpayment substantially increased. So far as the record reveals, they received nothing in return. Although other explanations have been offered,[3] one plausible explanation is that Ms. Buffington told them that the subordination agreements were something else. As the record stands, this factual question should be resolved at trial.

6(c).

IFC argues that, in order to prevail on a theory of fraud in the factum, the Changs must also prove that they were not negligent in signing the subordination agreements or, stated differently, that they had no reasonable opportunity to discover the true nature of the document they were signing.

---

[3]Mr. Gedan, IFC's principal, testified that Mr. Crouch told him that the Changs would sign because he and the Changs were old friends and had other business dealings. It is not clear that the Changs and the Crouches were friends at all, let alone old friends, and in any event only a profound friendship would support a detriment as large as that of the subordination agreements to the Changs. Mr. Crouch and Ms. Buffington both testified that the Changs agreed to the subordinations because the Changs had made misrepresentations to Hokulani about the duration of a rooftop lease for a cellular phone antenna site. Assuming that there was a misrepresentation (which the Changs deny), the cost to the Changs of the subordination agreements seems to dwarf the damages that might have flowed from such a misrepresentation. Further, Hokulani did not give up its misrepresentation claims in return for the subordinations. A reasonable jury could disbelieve both of these explanations.

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 795   Filed 04/13/09   Page 21 of 26

> [T]he defense of "fraud in the factum" is that of "excusable ignorance of the contents of the writing signed" and the party claiming such fraud "must also have had no reasonable opportunity to obtain knowledge."

Standard Finance Co. v. Ellis, 3 Haw. App. 614, 619, 657 P.2d 1056, 1060 (1983) (quoting Uniform Commercial Code § 3-305 cmt. 7).[4]  In other words, the perpetrator of the fraud must not only deceive the victim about the true nature of the document but also prevent the victim from learning the true nature of the document.  See, e.g., Kang, 59 Haw. at 659, 587 P.2d at 290 (where Harrington induced Kang's agent not to read the documents carefully by telling her that he was "in a hurry").

For the same reasons given in the preceding section, I conclude that a reasonable jury could decide that the Changs were not negligent and had no reasonable opportunity to determine the true nature of the subordination agreement.  For example, a jury might decide that Ms. Buffington told them that the Second Subordination Agreement was merely a receipt for the $10,000 check, that the Changs were not negligent in trusting their attorney, and that the Changs lacked a reasonable opportunity to find out what the document really was.  The Changs have a hard case to make, but I am not convinced that, if the jury were

---

[4]The Uniform Commercial Code does not apply directly to this case, but the Hawaii courts have applied UCC principles to real estate transactions by analogy.  See Romig v. deVallance, 2 Haw. App. 597, 604, 637 P.2d. 1147, 1152 (1981).

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 795   Filed 04/13/09   Page 22 of 26

presented only with the evidence submitted in connection with these motions, the court should direct a verdict in favor of IFC.

7.

IFC argues that the Changs ratified the subordination agreements when, in February 2006, after the Changs had filed this suit, they signed escrow instructions under which IFC would receive the first $150,000 and they would receive the next $100,000 in proceeds from each condominium sale. This argument lacks logic. If the subordination agreements were fully effective, IFC would have been entitled to receive <u>all</u> of the proceeds of sale until IFC's claim was paid in full. <u>See</u> docket no. 281-4 p. 5 ¶ 3, 281-5 p. 6 ¶ 5. Because the escrow instructions varied substantially from the subordination agreements, they do not constitute a ratification of the subordination agreements.

8.

The School Street property is registered land covered by the land court recording regime (sometimes called the "Torrens system"). Under Haw. Rev. Stat. § 501-82, every subsequent purchaser of registered land who takes a certificate of title for value, "except in cases of fraud to which [the purchaser] is a party," takes

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 795   Filed 04/13/09   Page 23 of 26

free from all encumbrances that are not noted on the transfer certificate of title ("TCT"). Package Products Co., Ltd. v. Teruya Brothers, Ltd., 58 Haw. 580, 586, 574 P.2d 524, 528 (1978); Honolulu Memorial Park, Inc. v. City and County of Honolulu, 50 Haw. 189, 436 P.2d 207 (1967) (a TCT holder takes free of unregistered encumbrances, including those of which the holder has knowledge); In re Bishop Trust Co., 35 Haw. 816, 825 (1941).

IFC is not a holder of the TCT for the School Street property because IFC is a mortgagee and the TCT is issued only to the fee simple owner. IFC is still entitled to rely on the TCT, however. The purpose of the land court registration system and Haw. Rev. Stat. § 501-82 is to preserve the integrity of titles. The Hawaii courts have held that, if purchasers in fee simple are entitled to rely on the protections of the TCT, those with interests less than fee simple are also entitled to the same protections. For example, the rights of the sublessee under an unregistered sublease are inferior to the rights of a person who subsequently obtained a registered lease. The subsequent lessee was "warranted in relying upon the integrity of the certificate of title" because to hold otherwise would "disregard the letter and spirit of the statute and would in a large measure nullify the [Torrens] Act." Akagi v. Oshita, 33 Haw. 343, 351 (1935).

Although a jury might reasonably find that the Changs were defrauded, there

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 795   Filed 04/13/09   Page 24 of 26

is no evidence that would reasonably support a jury finding that IFC was a party to that fraud. Therefore, IFC is entitled to a summary judgment determining that its mortgage on the School Street property is superior to the Changs' claims.

9.

The Changs argue that Ms. Buffington owed them fiduciary duties and has the burden of proving that all of her dealings with them were fair to the Changs. This is a correct statement of the law. The Changs go on to argue that anyone else who benefitted from any breach of Ms. Buffington's duties to the Changs should bear the same burden. The Changs offer no authority for this proposition.

10.

The Changs argue that IFC's mortgage liens should be subordinated to their interests "under principles of equitable subordination," 11 U.S.C. § 510(c). In order to subordinate the claim of a non-insider (such as IFC), "egregious conduct must be proved with particularity." In re Pacific Express, Inc., 69 B.R. 112, 116 (B.A.P. 9th Cir. 1986). There is no evidence that would support a reasonable jury finding that IFC engaged in "egregious conduct" of this sort. Therefore, IFC is entitled to summary judgment on this issue.

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 795   Filed 04/13/09   Page 25 of 26

11.

The Changs have filed a countermotion for summary judgment that asks the court to decide certain propositions of law. The prior sections of this decision discuss the legal issues which I think are ripe for decision based on the existing record. The other propositions advanced by the Changs should be decided if and when the facts warrant doing so.

* * *

The motion and countermotion are granted in part and denied in part as set forth above. Because this decision does not dispose of the entire case, no separate order shall be entered.

*/s/ Robert J. Faris*
**United States Bankruptcy Judge**
Dated: **04/13/2009**

U.S. Bankruptcy Court - Hawaii   #07-90054   Dkt # 795   Filed  04/13/09   Page 26 of 26